# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**THOMAS J. LASNOSKI,**
          **Plaintiff,**

      **v.**
                                   **Case No. 20-C-1836**

**CAPTAIN HEIDI MICHEL,**
**LT. JOLLY,**
**EMILY BLOZINSKI,**
**AIVA GONZALES,**
**DR. KEN ANULIGO, and**
**DIANE JENSEN,**
               **Defendants.**

---

## <u>DECISION ORDER</u>

Plaintiff Thomas J. Lasnoski, who is a prisoner at the Dodge Correctional Institution, filed a civil rights complaint alleging that the defendants violated his rights under federal and state law.[1] The plaintiff allegedly sustained serious injuries when he was involved in a vehicle collision and, because he had a warrant for his arrest, he was transferred to the Brown County Jail one week after surgery following the collision. The plaintiff alleges that defendants Nurse Emily Blozinski, Nurse Aiva Gonzales, and Dr. Ken Anuligo refused to follow the hospital's discharge orders, denied him pain medications, and refused to bathe him. The plaintiff also alleges that defendants Nurse Diane Jensen, Lieutenant Jolly, and Captain Heidi Michel were aware of the failure to properly address his medical issues and did nothing to address the problem. Based on these allegations, I allowed the plaintiff to proceed on a medical care claim under the Fourteenth Amendment

---

[1] The plaintiff filed this case *pro se*. On April 26, 2022, counsel filed a notice of appearance on behalf of the plaintiff. ECF No. 71.

and I exercised supplemental jurisdiction over his Wisconsin state law negligence claims. ECF No. 9.

Captain Michel and Lt. Jolly (Brown County defendants) have filed a motion for summary judgment. ECF No. 52. Dr. Anuligo and Nurses Blozinski, Gonzales, and Jensen (Medical defendants), who are represented by separate counsel, have also filed a motion for summary judgment. ECF No. 83. I will address the motions in this decision.

## I. BACKGROUND[2]

### A. Medical Defendants' Facts[3]

The plaintiff filed this case alleging a violation of his constitutional rights during his pretrial detention at the Brown County Jail. Medical Defendants' Proposed Findings of Fact (MDFOF), ECF No. 88, ¶ 1. WellPath, a healthcare company that contracts to provide healthcare services in prisons and jails, provided healthcare services for the jail at all times relevant to this litigation. *Id.* ¶ 2. WellPath employed Dr. Anuligo, Licensed Practical Nurse Blozinski, Registered Nurse Jensen, and Registered Nurse Gonzales to work in the jail's health services unit (HSU) during the relevant time. *Id.* ¶¶ 3-7.

On April 10, 2019, the plaintiff was seriously injured in a car accident. MDFOF ¶ 10; Plaintiff's Proposed Findings of Fact (PFOF), ECF No. 93, ¶ 1. The plaintiff was

---

[2] The court includes only material, properly supported facts in this section. *See* Fed. R. Civ. P. 56(c)(1).

[3] The plaintiff's proposed findings of fact (ECF No. 93) cite to his declaration (ECF No. 91) generally, not to any specific paragraph from his declaration. The court has tried to find the applicable paragraphs from his declaration to support his proposed findings of fact. The plaintiff's proposed findings of fact also cite to his 114 pages of exhibits (ECF No. 94). However, these exhibits are not authenticated, and I do not consider them. *See* Fed. R. Civ. P. 56(c); *Scott v. Edinburg*, 346 F.3d 752, 759-60 n.7 (7th Cir. 2003).

2

simultaneously arrested and transported to Froedtert Hospital's Trauma Center for treatment where he was diagnosed with thoracic and cervical spine fractures, a left acetabular fracture (pelvic fracture), liver laceration, and hemopneumothorax. MDFOF ¶¶ 12-13. At Froedtert, the plaintiff had orthopedic surgery to treat the pelvic fracture which was performed from an incision on his hip. *Id*. ¶ 14.

One week later, on April 17, 2019, the plaintiff was discharged from Froedtert and transferred to the Brown County Jail. MDFOF ¶ 15; PFOF ¶ 3. The plaintiff received discharge papers from Froedtert that provided instructions on his treatment going forward. MDFOF ¶ 16. Among other things, Froedtert's discharge papers identified the medication the plaintiff was prescribed and when the medications should be taken. *Id*. ¶ 17. When the plaintiff arrived at the jail, Dr. Anuligo reviewed the medications the physicians at Froedtert prescribed him. *Id*. ¶ 18. Dr. Anuligo decided to discontinue the plaintiff's prescriptions for gabapentin, guaifenesin, oxycodone, pantoprazole, and tizanidine. *Id*. ¶ 19; PFOF ¶ 17. Dr. Anuligo continued the plaintiff's prescriptions for acetaminophen (tylenol), calcium carbonate, cholecalciferol (vitamin d), enoxaparin, indomethacin, neomycin/bacitracin/polymyxin, polyethylene glycol, and senna/docusate. MDFOF ¶ 20. Dr. Anuligo also added prescriptions for two pain medications, duloxetine and meloxicam. *Id*. ¶ 21.

During the time period relevant to this litigation, the plaintiff made multiple complaints relating to the pain he was experiencing from the injuries he sustained in the motor vehicle accident. MDFOF ¶ 22. He specifically complained that he was not receiving the medication prescribed to him at Froedtert. *Id*. ¶ 23. Dr. Anuligo reviewed the plaintiff's pain complaints. *Id*. ¶ 24. Dr. Anuligo treated the plaintiff's pain complaints by

3

prescribing him a series of pain medications, including Tylenol, duloxetine and meloxicam, and he also altered the plaintiff's prescriptions and dosages when deemed necessary – such as prescribing additional pain medications (topamax and prednisone). *Id.* ¶ 25. The plaintiff found that the prednisone was "really helping" him with his pain. *Id.* ¶ 26. In addition to prescribing the plaintiff pain medications, Dr. Anuligo treated the plaintiff's pain complaints by prescribing him an additional mattress after he complained that a single mattress was not providing the comfort needed for his injuries, providing him an extra blanket after the plaintiff said he needed the extra blanket to support his neck and to sit on in the day room, allowing him to dim the lights in his cell, and educating him on various stretches to perform. *Id.* ¶ ¶ 27-30; PFOF ¶ 19.

Dr. Anuligo facilitated for the plaintiff five appointments with an external orthopedic specialist, BayCare Orthopedics and Sports Medicine Center. MDFOF ¶ 31; Medical Defendants' Response to PFOF (Med. Defs.' Resp. to PFOF), ECF No. 96, ¶ 15. The plaintiff visited BayCare on April 20, April 24, May 22, June 24, and October 20, 2019. MDFOF ¶ 31. In addition, he personally met with the plaintiff six times for his pain complaints (April 24, June 12, July 17, September 11, November 6, 2019, and February 26, 2020). MDFOF ¶ 32. During these consultations, Dr. Anuligo listened to the plaintiff's complaints, examined the plaintiff, commented on his healing progress, educated him on pain management techniques and stretches, and adjusted his medications. *Id.* ¶ 33. During these consultations, Dr. Anuligo found that the plaintiff's condition was improving, and his injuries were healing. *Id.* ¶ 34.

Nurse Blozinski, Nurse Jensen, and Nurse Gonzales could not and did not alter the plaintiff's pain management plan or prescriptions. MDFOF ¶ 39. When the plaintiff

4

arrived at the jail on April 17, 2019, Nurse Blozinski met with the plaintiff to inspect his surgical dressings and incision. *Id.* ¶ 40. Nurse Blozinski did not observe any leakage or symptoms associated with the plaintiff's incision and she replaced the plaintiff's dressings. *Id.*; Med. Defs.' Resp. to PFOF ¶ 26.

On April 18, 2019, the plaintiff sent an email to HSU stating that his dressings were to be changed every day. MDFOF ¶ 41; Med. Defs.' Resp. to PFOF ¶ 27. The plaintiff's discharge papers from Froedtert Hospital state that his dressing should be changed every day until the incision is dry for 24 hours and there is no drainage on dressings. MDFOF ¶ 42. On April 20, 2019, HSU responded to the plaintiff's request stating, "seen and changed dressing, no drainage." *Id.* ¶ 43. According to the plaintiff, his dressing on April 20, 2019, was encrusted with dried blood. PFOF ¶ 32; Declaration of Plaintiff, ECF No. 92, ¶ 33.

The plaintiff wrote a grievance on April 18, 2019, asking for "bath wipes." Med. Defs.' Resp. to PFOF ¶ 29. On the morning of April 19, 2019, Nurse Blozinski offered to help the plaintiff if he wanted to take a shower. MDFOF ¶ 44 The plaintiff requested to be provided wipes. *Id.* Nurse Blozinski then had HSU supply wipes to the plaintiff. *Id.*; Med. Defs.' Resp. to PFOF ¶ 36.

On April 20, 2019, during morning med-pass, Nurse Blozinski examined the plaintiff's incision and found that it was not leaking, was asymptomatic, and was healing well. MDFOF ¶ 45. Nurse Blozinski then changed the plaintiff's dressing. *Id.* The plaintiff asked Nurse Blozinski to wipe his feet and Nurse Blozinski wiped his feet and cleaned between his toes. *Id.*

5

On April 23, 2019, the plaintiff sent an email to HSU stating his incision was open and requesting that his dressing be replaced every day. MDFOF ¶ 46. That same day, Nurse Gonzales met with the plaintiff, inspected his incision, found that his sutures were intact and healing well, and changed his dressings. *Id.* ¶ 47.

Also on April 23, 2019, the plaintiff sent an email to HSU requesting a shave and stating that his neck hairs rubbing against his neck brace was causing irritation. MDFOF ¶ 48. Two days later, Nurse Blozinski met with the plaintiff pursuant to his request for a shave. *Id.* ¶ 49. The plaintiff showered himself with minimal assistance. *Id.* He shaved his neck while Nurse Blozinski secured his neck, Nurse Blozinski patted him dry, and Nurse Blozinski washed the pads of the plaintiff's neck brace. *Id.*

On April 30, 2019, the plaintiff sent an email to Nurse Blozinski stating that he wanted help taking a shower. MDFOF ¶ 50. That day, Nurse Blozinski met with the plaintiff pursuant to his email requesting a shower. *Id.* ¶ 51. The plaintiff was able to complete the shower and dry himself off without assistance. *Id.* Nurse Blozinski helped the plaintiff with putting his boxers on. *Id.*

On May 3, 2019, the plaintiff sent an email to Nurse Blozinski requesting that she assist him with showering and shaving. MDFOF ¶ 52. That same day, Nurse Blozinski met with the plaintiff. *Id.* ¶ 53. The plaintiff was able to shower himself and dry himself off without assistance, and Nurse Blozinski helped him get dressed. *Id.*

On May 8, 2019, the plaintiff sent an email to HSU requesting assistance taking a shower. MDFOF ¶ 54. That day, Nurse Gonzales met with the plaintiff. *Id.* ¶ 55. The plaintiff was able to shower and dry himself off without assistance; Nurse Gonzales helped the plaintiff put on his shorts and pants. *Id.*

6

On May 10, 2019, Nurse Gonzales met with the plaintiff for morning med-pass. MDFOF ¶ 56. The plaintiff was "very agitated and angry" and refused to take his medication. *Id.* The plaintiff exclaimed that he was going to take a shower. *Id.* After the plaintiff showered without assistance, he called Nurse Gonzales to help him dry off and clothe himself. *Id.* Nurse Gonzales did as she was requested. *Id.* The plaintiff apologized for his behavior. *Id.* On May 14, 2019, the plaintiff showered himself and called Nurse Gonzales to help him dry off and get dressed, which Nurse Gonzales did. *Id.* ¶ 57.

Outside of the above-mentioned requests for treatment, the plaintiff did not make any other requesting for hygiene related medical care to Nurse Blozinski or Nurse Gonzales. MDFOF ¶ 58. There is no record of the plaintiff making any complaints to Nurse Blozinski or Nurse Gonzales relating to the quality of care given to his hygiene. *Id.* ¶ 59. There is no record of the plaintiff making any complaints that he was covered in dried feces or blood. *Id.* ¶ 60.

The plaintiff states that he emailed Nurse Blozinski and reminded her that his last shower or bath was five days prior but he does not state when he did so. PFOF ¶¶ 41-42. He states that he was only aided with cleaning himself or showering seven times (April 20, April 25, April 28, May 3, May 8, May 10, and May 14, 2019). Pl. Decl. ¶ 29.

The plaintiff had eight treatment encounters with Nurse Jensen – March 30, 2020; December 4, 2019; April 26, 2019, April 27, 2019; April 25, 2019, April 18, 2019. MDFOF ¶ 62. During those encounters, Nurse Jensen did not perform and was not asked to perform any treatment related to the plaintiff's hygiene. *Id.* Further, the plaintiff did not make any complaints to Nurse Jensen regarding lack of hygiene care. *Id.*

The plaintiff had six treatment encounters with Dr. Anuligo. MDFOF ¶ 63. During those encounters, Dr. Anuligo did not perform and was not asked to perform any treatment related to the plaintiff's hygiene nor did the plaintiff make any complaints of lack of hygiene care. *Id.*

## B.     Brown County Defendants' Facts[4]

Captain Heidi Michel is the Brown County Jail's administrator. Brown Cnty. Defs.' Proposed Findings of Fact (BCFOF), ECF No. 53, ¶ 3. Lt. Jolly is a lieutenant there. *Id.* ¶ 4.

The Brown County Jail has established policies and procedures for prisoners and at the time of booking, prisoners are informed of these jail policies which includes how to access medical care. BCFOF ¶ 6.  *Id.* The jail's rules, including the procedure for access to medical care, also are included on the kiosk system, which prisoners must review and acknowledge before using the kiosk system. *Id.* ¶ 7. The plaintiff accessed the kiosk system for the first time on April 18, 2019. *Id.* ¶ 8. If an prisoner needs non-emergency medical care, he fills out a Request for Medical Care form which is then evaluated by medical staff. *Id.* ¶ 12. Prisoners also can request medical care through the jail's kiosk system. *Id.* Unless it is an emergency situation requiring immediate medical attention, jail officers or supervisors have no involvement in the evaluation of requests for medical care. *Id.* ¶ 13.

---

[4] The plaintiff has not submitted evidence in his response to the Brown County defendants' motion for summary judgment. His proposed findings of fact (ECF No. 69) cite to his unverified declaration (ECF No. 68) and to unauthenticated exhibits (ECF No. 68-1).

Captain Michel was generally aware of the plaintiff being booked into the Brown County Jail on April 17, 2019, given the circumstances of his transport there. BCFOF ¶ 18. Captain Michel did not have any direct contact with the plaintiff from April 17, 2019 until early November of 2019. *Id.* ¶ 19. Between April of 2019 and early November of 2019, Captain Michel was not involved in evaluating or responding to any grievance, appeal or requests for medical treatment involving the plaintiff, nor did she personally participate in any decision as to his medical care. *Id.* As part of regular meetings with jail health care staff along with discussions outside of those meetings, Captain Michel received general updates as to the status of various prisoners, which at times included the plaintiff. *Id.* ¶ 21. During those meetings and conversations with medical staff, Captain Michel was informed that the plaintiff was being seen, evaluated, and monitored by jail medical staff and outside medical professionals. *Id.* ¶ 22. Captain Michel did not believe and had no reason to suspect that the plaintiff's medical needs were not being properly and timely addressed. *Id.* ¶ 23. As jail administration has to make arrangements for transport of an prisoner outside of the jail, Captain Michel generally was aware the plaintiff was being transported outside of the jail on a regular basis for appointments with medical health care providers. *Id.* ¶ 25. Captain Michel relied on the information provided to her by jail medical staff that the plaintiff was receiving proper medical care. *Id.* ¶ 26.

In November of 2019, Captain Michel was informed the plaintiff had requested to meet with her to discuss his medical care and on November 20, 2019, Captain Michel met with the plaintiff to discuss his concerns. BCFOF ¶¶ 27, 30. During the meeting, the plaintiff complained about being charged for two medical visits and that he did not believe he was being provided with proper medical care because the jail medical staff was not

9

following Froedtert's discharge instructions for follow-up care. *Id.* ¶ 32. Captain Michel informed the plaintiff she would look into his complaints. *Id.* ¶ 33. Captain Michel investigated the complaints raised by the plaintiff which included further discussion with jail medical staff regarding his complaints about being wrongly charged for medical visits and that he was not being provided with necessary medical care. *Id.* ¶ 34. She asked jail medical staff about the Froedtert discharge instructions and about the plaintiff's care since April of 2019. *Id.* ¶ 35. Captain Michel was informed the plaintiff was being monitored by jail medical staff and outside medical providers and that both jail medical staff and outside medical specialists had seen and evaluated him several times. *Id.* ¶ 36. Captain Michel was informed that all the plaintiff's medical needs were being monitored and addressed. *Id.* Based on the information obtained by Captain Michel, she believed the plaintiff's medical needs were being properly addressed. *Id.* ¶ 37.

On December 5, 2019, Captain Michel told the plaintiff that she spoke with jail medical staff about his complaints and concerns and that, based on the information she obtained, he was receiving all the necessary and appropriate medical treatment. BCFOF ¶¶ 40-41. Captain Michel also informed the plaintiff that medical staff was still looking into the copays for two visits he complained about but had not yet heard back from corporate on that issue. *Id.* ¶ 42. Based on Captain Michel's investigation which included discussions with jail medical personnel in November of 2019, it was her understanding and belief that the plaintiff was receiving all necessary and appropriate medical care. *Id.* ¶ 44. Captain Michel was not aware of any specific medical issue or need that was not being addressed or that jail medical staff were not providing the care needed. *Id.* ¶ 45.

10

Lt. Jolly did not have any direct in-person contact with the plaintiff in 2019 or 2020 regarding his complaints of improper medical care. BCFOF ¶ 48. Lt. Jolly was not involved in evaluating any medical request or determining what medical treatment should be provided to the plaintiff. *Id.* ¶ 49. Lt. Jolly's only contact with the plaintiff in 2019 regarding his medical care was responding to two grievances/appeals. *Id.* ¶ 50.

The first grievance Lt. Jolly was involved in was Grievance No. 19-1604 wherein on October 4, 2019, the plaintiff complained about the grievance procedure and whether it was appropriate for a medical staff member to respond to the grievance when he was complaining about medical care. BCFOF ¶ 51. Lt. Jolly responded to the grievance and stated that even though the plaintiff may not agree with the grievance process, that was the process in place. *Id.* ¶ 52. Lt. Jolly also explained that she was unable to address any claim he may have about medical care as the plaintiff had not identified any specific complaint she could investigate. *Id.* Lt. Jolly also responded to the plaintiff's Grievance Appeal No. 2019-2164 which was submitted on December 27, 2019, in which he inquired about the status of a prior grievance appeal and asked why it had not yet been answered. *Id.* ¶¶ 53-54. Lt. Jolly investigated the status of the grievance appeal and determined that it was still being evaluated by jail medical staff. *Id.* ¶ 55. After that investigation, on December 28, 2019, Lt. Jolly informed the plaintiff in her response to the grievance appeal that the issue that was the subject of his prior grievance appeal was still being looked into by jail medical staff and that the grievance process can take time. *Id.* ¶ 56.

Lt. Jolly was not aware of any specific medical issue of the plaintiff that was not being addressed or that jail medical staff allegedly were not properly following the Froedtert discharge instructions for follow-up care. BCFOF ¶ 57. Lt. Jolly only was aware

11

generally that the plaintiff was being seen by jail medical staff or other medical personnel during his confinement at the Brown County Jail. *Id.* ¶ 58. Lt. Jolly relied on the assessments and determinations of the jail medical staff as to what medical treatment was necessary for the plaintiff. BCFOF ¶ 60. She was not provided and was not aware of the Froedtert discharge orders prior to this lawsuit being filed. *Id.* ¶ 61.

Before filing this lawsuit on December 11, 2020, the plaintiff did not file any Notice of Claim pursuant to Wis. Stats. § 893.80. BCFOF ¶ 5.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B. Analysis

#### 1. Medical Defendants' Motion for Summary Judgment

A claim under 42 U.S.C. § 1983 that a state pretrial detainee has received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause. *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020) (citing *Miranda v. Cty. of Lake*, 900 F.3d 335, 346-47 (7th Cir. 2018)). Claims of inadequate medical care while in pretrial detention are subject to an objective reasonableness standard. *Id.* (citing *Miranda*, 900 F.3d at 352). The plaintiff bears the

12

burden to demonstrate objective unreasonableness, and he must make a two-part showing. *Id.* First, he must show that the defendants acted purposefully, knowingly or recklessly when considering the consequences of their response to the medical condition at issue in the case. *Id.* (citing *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018)). Second, the plaintiff must show that the challenged conduct was objectively unreasonable given the totality of the relevant facts and circumstances. *Id.*

The plaintiff claims that Dr. Anuligo violated his constitutional rights because he changed the plaintiff's pain medications as set forth in Froedtert's discharge instructions. A jail doctor is a prisoner's primary care doctor, and he is therefore free to make an independent medical determination about the necessity of certain treatments or medications. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). "[S]o long as the determination is based on the physician's professional judgment and does not go against accepted professional standards," there is no constitutional violation. *Id.* A doctor enjoys wide boundaries when making medical decisions in a custodial setting, especially when treating pain. *See Williams v. Patton*, 761 F. App'x 593, 597 (7th Cir. 2019) (observing in a Fourteenth Amendment context that a plaintiff must show that medical treatment was such a significant departure from professionals norms" that it was objectively unreasonable); *Holloway*, 700 F.3d at 1073, 1075 (doctor did not act with deliberate indifference when he prescribed non-narcotic pain medications, and plaintiff presented no evidence that the doctor intended to cause plaintiff pain or that prescribing non-narcotic medications would not alleviate plaintiff's pain); *see also Lockett v. Bonson*, 937 F.3d 1016, 1024-25 (7th Cir. 2019) ("We routinely have rejected claims, however,

where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a substantial departure from acceptable professional judgment.").

It is undisputed that when the plaintiff arrived at the Brown County Jail, Dr. Anuligo reviewed the medications the doctors at Froedtert had prescribed the plaintiff, discontinued five of them, continued eight of them, and added two pain medications. Plaintiff complained about his ongoing pain and in response Dr. Anuligo continued to review plaintiff's prescriptions, adjusted the doses of his pain medications, and prescribed new medications as he deemed necessary. Dr. Anuligo treated the plaintiff's pain in other ways, for example, by authorizing him to have an extra mattress and blanket, to dim the lights in his cell, and educating him on stretches to perform. Overall, Dr. Anuligo met with the plaintiff six times and during these consultations he listened to the plaintiff's complaints, examined him, commented on his healing progress, educated him on pain management techniques, and adjusted his medications.

Contrary to the plaintiff's assertions, Dr. Anuligo was not required to follow Froedtert's discharge instructions. Rather, Dr. Anuligo was free to make his own judgments so long as they conformed with accepted professional standards. The plaintiff has not presented evidence to show that Dr. Anuligo's decisions to discontinue some of his pain medications and substitute them for other pain medications were a departure from accepted professional standards or otherwise objectively unreasonable. There is no indication that Dr. Anuligo prescribed the pain medications he did without exercising professional judgment. Rather the record shows that Dr. Anuligo considered the plaintiff's medical needs and adjusted his medications as necessary. Plaintiff argues that three of the medications Dr. Anuligo prescribed—Tylenol, Meloxicam, and Duloxetine—were not

14

appropriate to treat his injuries. But apart from the unauthenticated exhibits which I may not consider, the only evidence plaintiff cites to is his own declaration that the medications were inappropriate. At most, this evidence suggests that plaintiff would have preferred a different course of treatment, but it does not suggest that Dr. Anuligo's treatment was unreasonable or fell outside the bounds of professional standards.

Plaintiff also argues that his care plan recommended physical therapy, a recommendation that he alleges Dr. Anuligo did not follow. But plaintiff cites only to his unauthenticated exhibits to support the fact that physical therapy was actually ordered, and I may not consider this evidence. Even if I could, Dr. Anuligo was entitled to reach his own conclusions about how to proceed with plaintiff's care so long as they were reasonable. Plaintiff again offers no evidence that Dr. Anuligo's care was unreasonable or fell outside the bounds of professional standards other than his own declaration that he should have been provided physical therapy. At most this suggests he disagreed with Dr. Anuligo about his treatment, and on its own does not support an inference that his care was objectively unreasonable.

A reasonable factfinder could not conclude Dr. Anuligo's treatment decisions were unreasonable and I will therefore grant the medical defendants' motion for summary judgment as to the plaintiff's Fourteenth Amendment claim against the doctor.

The plaintiff claims that Nurse Blozinski and Nurse Gonzales violated his constitutional rights because, contrary Froedtert's discharge instructions, they did not change his surgical dressing daily. As an initial matter, the plaintiff's discharge papers from Froedtert did not state that his dressing needed to be changed daily. Rather, the instructions stated that his dressing should be changed every day until the incision was

15

dry for 24 hours and there was no drainage on the dressing. Regardless, as explained above, the medical staff was not required to follow the discharge orders so long as their care was reasonable and followed appropriate medical standards. It is undisputed that Nurse Blozinski changed the plaintiff's dressing on the day he arrived at the jail, April 17, 2019, and that she did not observe any leakage at that time. On April 20, 2019, Nurse Blozinski changed his dressing and observed that it was not leaking, asymptomatic, and was healing well. On April 23, 2019, Nurse Gonzales inspected the plaintiff's incision, found that his sutures were healing well, and changed his dressing. Plaintiff argues that his dressing contained dried blood on April 20, 2019, but does not otherwise dispute Blozinski's conclusion that the incision was not leaking and was healing well. The fact that his dressing contained dried blood on one occasion is does not support an inference that the frequency with which they were changed was unreasonable. Moreover, and more importantly, plaintiff points to no evidence that any delay in changing the dressing harmed the plaintiff in any way. Without some evidence of harm, his claim necessarily fails. *Miranda v. County of Lake*, 900 F.3d 335, 347 (7th Cir. 2018) (to recover on a due process claim, plaintiff must present verifying medical evidence that the delay caused some degree of harm). Accordingly, I will grant the defendants' motion for summary judgment as regards this issue.

Plaintiff also argues that Blozinski and Gonzales violated his constitutional rights by failing to respond to his requests for help bathing and his requests for bathing wipes. Plaintiff asserts that he alerted HSU multiple times that he needed to be bathed or that he required wipes. Most of these assertions is supported with a citation to unauthenticated exhibits which were filed without an accompanying affidavit, and I may not consider such

evidence. At least one such assertion, however, is supported by a citation to plaintiff's own declaration.[5] Plaintiff's declaration does state that he informed Blozinski and Gonzales he needed wipes and requested help bathing, but it does not state when these events occurred. Without knowing when plaintiff made these requests, a factfinder could not infer that Blozinski and Gonzales did not respond to them in a reasonable time frame; it is undisputed that Blozinski and Gonzales did, at various points, provide plaintiff with wipes and help him bathe.

The record does not support a finding that Blozinski or Gonzales were aware that the plaintiff had an untreated medical need or that their responses to his requests for assistance were unreasonable. I will therefore grant the medical Defendants' motion for summary judgment as to the plaintiff's constitutional claims against Blozinki and Gonzales.

Lastly, the plaintiff claims that Nurse Jensen did not properly respond to his requests for help with his medical care issues. However, it is undisputed that the plaintiff's eight treatment encounters with Nurse Jensen did not involve hygiene issues and that the plaintiff did not make any complaints to Nurse Jensen regarding lack of hygiene care. To the extent that the plaintiff claims that Nurse Jensen denied his grievances related to his treatment for pain, he has no claim against her because she merely allegedly ruled on an administrative complaint, *see Owens v. Hinsley*, 635 F.3d 950, 953-54 (7th Cir. 2011), and because I have determined that the plaintiff's claim against Dr. Anuligo based on the

---

[5] Plaintiff has filed two declarations. The proposed findings of fact do not specify which declaration they are citing to, but I will assume plaintiff meant to cite to the declaration at ECF no. 91 which he filed with his response to the medical defendants' motion for summary judgment.

failure to prescribe certain pain medications fails on the merits. Thus, I will grant the medical defendants' motion for summary judgment as to the plaintiff's constitutional claim against Nurse Jensen.

      2.     <u>Brown County Defendants' Motion for Summary Judgment</u>

The Brown County defendants contend that they are entitled to qualified immunity because they did not violate the plaintiff's Fourteenth Amendment rights and the plaintiff cannot meet his burden that any Fourteenth Amendment right was clearly established at the time of the incident. ECF No. 52 at 9. According to these defendants, Lieutenant Jolly lacked personal involvement in the alleged constitutional violation because his only involvement was responding to grievances and appeals submitted by the plaintiff in October and December 2019, that did not directly involve the particular of the medical care being provided. *Id.* at 12. In addition, they contend that Captain Michel acted reasonably and not in violation of the plaintiff's Fourteenth Amendment rights. *Id.* at 14. The defendants also contend that Captain Michael and Lieutenant Jolly appropriately and reasonably relied on information from medical staff that the plaintiff's medical complaints and issues were being timely and properly addressed and they had no reason to doubt that treatment was not adequate or proper. *Id.* at 16-17.

In response, the plaintiff contends that it was "apparent that both defendants were aware of the constitutional violations of the medical defendants but chose to turn a blind eye." ECF No. 66 at 2. However, the plaintiff has not proven this by citing to evidence in the record. Moreover, I have determined that a reasonable factfinder could not conclude that Dr. Anuligo, Nurse Blozinski, Nurse Gonzales, or Nurse Jensen (the medical defendants) violated the plaintiff's constitutional rights.

18

Even if there was a factual dispute whether the medical defendants violated the plaintiff's constitutional rights, it is undisputed that Captain Michel had no direct contact with the plaintiff until November 2019, four months after he arrived at the jail. During that time, while she was generally aware of the plaintiff's medical care inside and outside the jail, she had no reason to think his medical needs were not being properly addressed. After Captain Michel's November 20, 2019, meeting with the plaintiff during which he said he did not think he was being provided with proper medical care, she investigated his complaints. Captain Michel specifically investigated the plaintiff's complaint that Dr. Anuligo did not prescribe the same pain medication as the doctors at Froedtert. Based on Captain Michel's discussion with jail medical staff, she believed the plaintiff's medical needs were being properly addressed.

The record shows that Captain Michel met with the plaintiff, investigated his complaints, and reasonably relied on the jail's medical staff members' information that they were caring for the plaintiff's medical needs. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018) ("We have long recognized the fact that correctional institutions (like most entities in a modern economy) engage in the division of labor" and "when detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention."); *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013). Thus, a reasonable factfinder could not conclude that Captain Michel violated the plaintiff's constitutional rights.

Turning to Lt. Jolly, his role was limited to ruling on a grievance and an appeal that did not relate directly to the plaintiff's medical care at issue in this case. Section 1983 limits liability to public employees who are personally responsible for a constitutional

19

violation. *Burks v. Raemisch*, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). The plaintiff has not shown that Lt. Jolly had any involvement in his medical care issues.

In sum, I will grant the Brown County defendants' motion for summary judgment as to the plaintiff's constitutional claims.

3.   State Law Claims

Because I have concluded that the plaintiff has no federal claim, I will relinquish supplemental jurisdiction over the plaintiff's state law claims. *See* 28 U.S.C. §1367(c)(3); *Lavite v. Dunstan*, 932 F.3d 1020, 1034-35 (7th Cir. 2019).

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Brown County defendants' motion for summary judgment (ECF No. 51) is **GRANTED**.

**IT IS FURTHER ORDERED** that the medical defendants' motion for summary judgment (ECF No. 83) **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing this case.

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee

regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed in forma pauperis with this Court. *See* Fed. R. App. P. 24(a)(1).

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. See Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 26th day of September, 2022.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge

21